BOEHCK CONSTRUCTION EQUIPMENT CORPORATION, Plaintiff, v. H. FULLER & SONS, INC., and another, Defendants.

*April 1—April 30, 1963.*

.For the plaintiff there were briefs and oral argument by *Thomas J. Bergen* of. Milwaukee.

For. the defendants there were briefs and oral argument by *Willis J. Zick* of Waukesha.

FAIRCHILD, J. 1. *Nature of the defects.* There was ample testimony that, the backhoe was subject to two types of difficulty which were unusual, at least in degree, for such machines. Overheating caused the clutch and brake bands to work improperly and friction of, the machine's cables with themselves or other parts of the machine was excessive, and broke or wore out cables at an unusual rate.. Boehck's mechanics and representatives of Insley, the manufacturer, made more than 10 service calls from April to November, and endeavored to make adjustments to correct the problems. In October the machine was in Boehck's shop for three days and alterations made. One hundred sixty hours were spent in such efforts and no charge made to Fuller. Both parties thought each time .that the breakdown was minor and could be corrected to give no further trouble. There were numerous repetitions, however, and Pares, Boehck's salesman, conceded that there was much .more downtime and mechanical difficulty than would ordinarily be expected. Ultimately Boehck sent the machine back to the manufacturer. The court's finding that the particular machine was not reasonably fit for the intended .use was .not against the great weight and clear preponderance of the evidence.

2. *Implied warranty.* The model M was a relatively new model put out by the Insley company. Boehck had not previously had one. After discussion between Pares and Fuller concerning various machines for Fuller's use, Boehck pur-

chased the backhoe in reliance on Fuller's willingness to lease it for at least seven months. There was testimony tending to show that Fuller relied on Pares' judgment in agreeing to rent a model M Insley for seven months although it clearly appeared that Pares disclaimed any knowledge of the new model except from reading and hearing about it. The court found that Fuller relied on Pares' opinion.[1] In any event, Pares conceded that by usage of the trade with respect to rentals, there was a warranty that the machine was fit to do the work it was designed to do.[2]

Boehck claims that a provision of the written lease negatived an implied warranty. In a paragraph in which the lessee agreed to maintain the machine, the lessee agreed "to hold the lessor harmless from all claims arising from defects therein." Undoubtedly this language would impose on the lessee the ultimate burden of the claim of any third party arising out of a defect in the machine while in the lessee's possession; but except to that extent it does not expressly negative an implied warranty.[3] Although the Uniform Sales Act, ch. 121, Stats., operates directly upon transfers of property or agreements to transfer property (not present in this lease), portions of the act, including sec. 121.15 describing the circumstances under which implied warranties arise, are declaratory of the common law.[4]

---

[1] See Uniform Sales Act, sec. 121.15 (1), Stats., for warranty of fitness for particular purpose and sub. (2) for warranty of merchantable quality.

[2] See sec. 121.15 (5), Stats., for warranty annexed by usage of trade.

[3] See *Hyland v. GCA Tractor & Equipment Co.* (1957), 274 Wis. 586, 80 N. W. (2d) 771, for clauses held to be a sufficient disclaimer of implied warranty. See also Anno. 68 A. L. R. (2d) 850, 863, sec. 7.

[4] *Milwaukee Tank Works v. Metals Coating Co.* (1928), 196 Wis. 191, 193, 218 N. W. 835.

"It appears to be the general rule that, in the absence of an agreement to the contrary, the lessor of a chattel to be used by the lessee for a particular purpose known to the lessor impliedly warrants the reasonable suitability of the chattel for the lessee's known intended use of it." [5]

The court's finding of an implied warranty was not against the great weight and clear preponderance of the evidence.

3. *Notice of breach of warranty.* In the memorandum decision, the circuit court said:

"The equipment in question is not as it was in *Milwaukee Tank Works v. Metals Coating Co.,* 196 Wis. 191, such a 'complicated and delicately adjusted mechanism which was procured to accomplish a definite purpose.' It was rather 'an Insley M backhoe' whose capacity for the fitness of the work for which it had been procured could have and should have been discoverable by the defendants within a reasonable time. The defendants have been engaged in the contracting business for ten years, and should have been able to tell within a reasonable time that the equipment in question was not fit for their purpose. At the time such discovery was made it was incumbent upon the defendants to give notice to the plaintiff of the breach of any promise or warrant. No such notice was given."

It is true that Fuller repeatedly complained of problems with the machine and Boehck always attempted to remedy them without charge. It is argued that Boehck thus had all the notice it needed that the machine did not comply with the warranty and was recognizing its obligation to correct it. It was conceded by Fuller, however, that the problems were considered minor each time they arose and that after each repair, both parties believed the trouble had been corrected. It might be said under the circumstances that there was a series of acceptances by Fuller. We think the

---

[5] Anno. 68 A. L. R. (2d) 850, 854, sec. 4.

circuit court could reasonably find under the circumstances that Fuller should sooner have made its position known if it intended to claim more than the repair service which Boehck supplied voluntarily.

Sec. 121.49, Stats., provides that acceptance of goods by the buyer does not discharge the seller from liability in damages or other legal remedy for breach of warranty. But, if, after acceptance, the buyer fails to give notice to the seller of the breach within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor. The notice required is not of the facts concerning the breach but of the buyer's claim that they will constitute a breach and must advise the seller that the buyer is looking to him for damages.[6]

As previously noted the Uniform Sales Act does not operate directly upon any lease which does not involve a contract to transfer property in the goods. It is also true that sec. 121.49, Stats., is not in some respects declaratory of the common law.[7] While it may be arguable that the notice required from a lessee of personal property is something less than is required from a buyer under the statute, we conclude that the requirements as a matter of history are closely similar and as a matter of policy should be the same.

This court has held at common law that where defects in property are discoverable by the exercise of ordinary care at the time of delivery, the purchaser waives his remedy if he accepts the property and fails then, or within a reasonable time thereafter, to notify the seller that "the property will not be considered as in satisfaction of the contract."[8] Where

---

[6] *Mack Trucks, Inc., v. Sunde, ante,* pp. 129, 136, 119 N. W. (2d) 321.

[7] See 1A U.L.A., note 92, pp. 114, 115, sec. 49.

[8] *Northern Supply Co. v. Wangard* (1903), 117 Wis. 624, 630, 94 N. W. 785.

complicated equipment was leased and where a considerable period of use and adjustment may be required before the defects can be ascertained, it has been held that the period of time before notice is required may be very substantial.[9] The character of the property and the circumstances of its use may make a difference in the length of time which can be considered reasonable, but it seems to us to be sound policy to require the lessee, as well as a buyer, to make his position clear within a reasonable time after he knows or ought to know of the defects which he claims constitute a breach. Fuller retained and used the backhoe throughout the lease period and, in fact, for an additional period and, except for reporting the problems in the operation of the machine, gave no express notice that those problems were claimed to be a breach of warranty for which damages would be sought. The finding that Fuller ought to have known of the breach early in the lease period, but gave no notice of breach is not against the great weight and clear preponderance of the evidence.

4. *Disallowance of $3,400 rental for Lima shovel.* Boehck furnished a Lima shovel to Fuller about October 10th. Fuller used it, or a replacement for it, apparently full time, for two months. The ordinary rent for it would be $1,700 per month. There was conflicting testimony about the terms under which it was furnished. One version was that Boehck furnished it free of charge, but only to be used when the Insley M was not in operation. The other was that it was furnished, free, for full use in order to make up for time lost because of trouble with the Insley. The court believed the latter. The finding may stand.

5. *Disallowance of item for cable.* Although this was included in the account, it appears that Boehck intended to

---

[9] *Milwaukee Tank Works v. Metals Coating Co., supra,* footnote 4.

donate it because of the backhoe's excessive usage of cable. This disallowance may stand.

6. *The equitable setoff.* In arriving at the 46 percent equitable setoff against rent, the court used figures offered by Fuller for the purpose of establishing damages. Because of the failure with respect to notice of breach, Fuller could not recover damages in any event.

Fuller used the Insley M backhoe on two sewer-line projects, one at Ixonia and one at Waukesha. The backhoe was at Ixonia from April 21st to the last of August, and the project was completed by using another piece of equipment belonging to Fuller. The backhoe was at Waukesha from September 1st to December 16th. Fuller's figures showed that 12,280.5 man-hours were expended on the sewer-line installation on both projects. Fuller claimed that with a properly functioning backhoe, only 6,631 man-hours would have been required. This figure is 54 percent of the man-hours actually expended. In computing damages, Fuller claimed 46 percent of the total wage cost of $36,953.41, and the court found that the machine was unproductive 46 percent of the time, using the same figures.

No records were produced to prove the amount of time which elapsed while the backhoe was not operating and the men were present and drawing wages. No witnesses were asked to estimate that amount. Much of the repair work was done outside of normal working hours. There was a reference by one of the Fullers to an estimate that the machine averaged only six and one-half hours of an eight-hour day. This estimate would lead to the conclusion that it was unproductive only 19 percent of the time.

The figure of 6,631 man-hours as the amount which should have been required was arrived at as follows:

With respect to the Ixonia project, the civil engineer who designed the project testified that the lines constructed

totaled 7,130 feet and that an average crew under the soil conditions and depth should average about 150 feet per day. He based his estimate on a crew of six or seven men, working an eight-hour day. He said it would vary depending on the efficiency of the crew, the efficiency of the machine, and the weather. Total man-hours were computed accordingly, on the basis of a seven-man crew.

The civil engineer on the Waukesha project testified that 9,024 feet of line were installed and that 120 to 130 feet average per day is reasonable to expect of a six-man crew. This would vary with the efficiency of the crew, the type, age, and efficiency of the machinery and the type of ground, as well as weather. Total man-hours were computed, using 120 feet per day as the average, and allowing a 10 percent addition for bad weather.

The testimony of the engineers was not based on any particular type or quality of machine, nor any assumptions as to the amount of downtime which would be considered normal or usual for equipment of this type. The record shows that machines vary in quality and that in setting rentals it is customary to make an allowance for downtime. At best this would seem to be a dubious basis for an award of damages or a finding of the comparative productivity of the particular machine.

We think, however, that the equitable setoff is barred by the failure to give notice of breach, just as the action for damages is barred. We do not say that a court may never use its equity power to ameliorate injustice in a situation where the legal remedies for breach of warranty have been lost, but we think the same considerations apply here with respect to a reduction in rent as with respect to damages. If the machine was really only 54 percent productive, Fuller knew that in May as well as later. After a reasonable amount of experience with the machine, the lessee should have made

its position clear to the lessor and if it failed to notify the lessor that it would seek damages or other remedies, it must be satisfied with the performance made by the lessor.

*By the Court.*—Judgment modified by adding the sum of $3,220 to the damages and $429 to the interest and, as so modified, affirmed.